Edith M. COTTRILL, Plaintiff,

v.

Kenneth S. APFEL, Commissioner of
the Social Security Administration,
Defendant.

Civil No. L–99–1447.

United States District Court,
D. Maryland.

June 27, 2000.

Anthony R. Mignini, Mignini, Raab & Lidinsky, Baltimore, MD, for plaintiff.

Lynn A. Battaglia, U.S. Atty., Baltimore, MD, Allen F. Loucks, Office of U.S. Atty., Baltimore, MD, for defendant.

## MEMORANDUM

GESNER, United States Magistrate Judge.

### I. *Background*

Plaintiff, Edith M. Cottrill, brought this action, pursuant to 42 U.S.C. § 405(g), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability insurance benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 401–433. Currently pending are Plaintiff's Motion for Summary Judgment, Defendant's Motion for Summary Judgment, and Plaintiff's Response to Defendant's Motion for Summary Judgment.[1] (Paper Nos. 13, 14 and 15). These motions have been assigned to the undersigned on consent of the parties pursuant to 28 U.S.C. § 636 and Local Rule 301. No hearing is deemed necessary. Local Rule 105.6. For the reasons that follow, this Court grants Plaintiff's Motion for Summary Judgment, denies Defendant's Motion for Summary Judgment, and remands this case to the Commissioner for further proceedings consistent with this Memorandum.

Ms. Cottrill applied for disability insurance benefits on February 5, 1996 alleging an inability to work since June 24, 1992 due to chronic cystitis,[2] removal of her right kidney, recurrent urinary tract infections, inflammation in her remaining kidney, back and right flank pain, and a history of right arm surgeries. (Record ("R") 100). The Social Security Administration denied her application initially and upon reconsideration. (R. 89–91, 94–96). An Administrative Law Judge ("ALJ") held a hearing on June 6, 1997 at which Ms. Cottrill was represented by a paralegal. (R. 29–86). On October 20, 1997, the ALJ issued a decision finding Ms. Cottrill not disabled. (R. 10–22). On April 6, 1999, the Appeals Council denied Ms. Cottrill's request for review making the decision of the Commissioner final and reviewable. (R. 5–6).

### II. *Standard of Review*

 The role of this Court on review is to determine whether substantial evi-

---

1. Defendant filed a Request to File a Reply Brief in Response to Plaintiff's Response to Defendant's Motion for Summary Judgment and an accompanying Supplemental Memorandum. (Paper No. 16). Plaintiff filed a Response opposing Defendant's Request to File a Reply Brief. (Paper No. 17). Defendant's Supplemental Memorandum mainly addresses an issue of law which has been recently settled by the Supreme Court and

does not otherwise add to the discussion of the substantive arguments in this case. Accordingly, the Court will deny Defendant's Request to File a Reply Brief.

2. Cystitis is defined as "inflammation of the urinary bladder." *Dorland's Medical Dictionary* 420 (28th Ed.1994).

dence supports the ALJ's decision and whether the ALJ applied the correct legal standards. 42 U.S.C. § 405(g) (1991); *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990). This Court cannot try the case *de novo* or resolve evidentiary conflicts but rather must affirm a decision supported by substantial evidence. *Hays,* 907 F.2d at 1456. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Teague v. Califano,* 560 F.2d 615, 618 (4th Cir.1977). It is more than a scintilla but less than a preponderance of the evidence presented. *Shively v. Heckler,* 739 F.2d 987, 989 (4th Cir.1984). It is such evidence sufficient to justify a refusal to direct a verdict if the case were before a jury. *Hays,* 907 F.2d at 1456. In reviewing for substantial evidence, the Court does not weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the agency. *Id.*

This Court must also determine whether the ALJ properly applied the law. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir.1987).

In determining whether one is disabled, the Commissioner has promulgated regulations that set forth a five-step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520. This five-step process, described by the Supreme Court in *Bowen v. Yuckert,* 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), begins with the ALJ determining whether the claimant is engaged in substantial gainful activity as defined in 20 C.F.R. § 404.1571 and § 416.971 *et seq.* If the claimant is engaged in a substantial gainful activity, the claimant is considered not disabled. 20 C.F.R. §§ 404.1520(a) and 416.920(a). If the claimant is not engaged in a substantial gainful activity, the ALJ, at the second step, examines the physical and/or mental impairments alleged by the claimant and determines whether these impairments meet the durational and severity requirements set forth in 20 C.F.R. § 404.1520 and § 416.920.

If the durational and severity requirements are met, the ALJ's analysis proceeds to a third step—a consideration of whether the impairment or impairments, either severally or in combination, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is known as the Listing of Impairments ("Listing"). If one of the Listings is met, disability will be automatically found without consideration of age, education, or work experience. If a Listing is not met, however, the ALJ then moves to a fourth step and considers whether the claimant retains the residual functional capacity ("RFC") to perform past relevant work. If the ALJ finds that a claimant does retain the RFC to perform past relevant work, then the claimant will be found to be not disabled.

If a determination is made that the claimant is not capable of performing past relevant work, the ALJ moves to a fifth and final step and considers whether, based upon the claimant's RFC, age, education, and past work experience, the claimant is capable of some other work. The burden shifts to the Commissioner at this step. *Pass v. Chater,* 65 F.3d 1200, 1203 (4th Cir.1995). If the claimant suffers solely from exertional impairments,[3]

---

**3.** Impairments may be exertional and nonexertional. An exertional impairment is one that affects the claimant's ability to meet the strength demands of certain jobs. 20 C.F.R. §§ 404.1569a and 416.969a. A nonexertional impairment is a "limitation that is present whether a claimant is attempting to perform the physical requirements of the job or not." *Gory v. Schweiker,* 712 F.2d 929, 930 (4th Cir.1983). "[W]here the claimant's impairment is nonexertional—not manifested by a loss of strength or other physical abilities—or is marked by a combination of exertional and nonexertional impairments, the [Guidelines'] Rules are not conclusive, and full individualized consideration must be given to all relevant facts of the case." *Grant v. Schweiker,* 699 F.2d 189, 192 (4th Cir.1983).

the Medical–Vocational Guidelines, as defined in part 404, Subpart P, Appendix 2 (the "Guidelines"), provide rules to be applied in determining whether a claimant is disabled. *Gory v. Schweiker,* 712 F.2d 929, 930 (4th Cir.1983). An ALJ, in applying the Guidelines, will examine the claimant's age, education, work experience, and residual functional capacity ("RFC") to determine which rule applies. *Gordon v. Schweiker,* 725 F.2d 231, 235 (4th Cir. 1984). The rule will direct a conclusion as to whether a claimant is disabled. *Gory,* 712 F.2d at 930.

The Guidelines, however, will not be used when the claimant suffers from both exertional and nonexertional impairments. *Smith v. Schweiker,* 719 F.2d 723, 725 (4th Cir.1984). In such a case, the ALJ is required to employ the use of a vocational expert to determine whether the claimant is still capable of some work. *Grant v. Schweiker,* 699 F.2d 189, 192 (4th Cir. 1983). If the claimant is not capable, disability will be found.

### III. *ALJ's Decision*

The ALJ evaluated Ms. Cottrill's claim for disability insurance benefits using the above-described, five-step sequential process set forth in 20 C.F.R. § 404.1520. At the first step, the ALJ determined that Ms. Cottrill had not engaged in substantial gainful activity since June 24, 1992. (R. 21). At step two, the ALJ determined that Ms. Cottrill did not have a "severe impairment" which significantly limited her ability to perform basic work activities prior to the expiration of her insured sta-

tus. (*Id.*). Thus, he found Ms. Cottrill not disabled. (*Id.*).

### IV. *Summary of Evidence*

Ms. Cottrill was born on July 8, 1950 and was forty-seven years old at the time of the ALJ's disability decision. (R. 100). She obtained her GED in 1974. (R. 39). She last worked in June 1992 as a machine operator in the manufacture of credit cards. (R. 39, 118). She has also worked as a nursing assistant in a nursing home, a cashier/inventory clerk, and a packer/shipper. (R. 75–76, 118). In 1992, Ms. Cottrill began experiencing severe pain in her back and right flank.[4] (R. 15, 187, 194).

On August 10, 1992, Ms. Cottrill was admitted to the hospital complaining of severe right lower back pain. (R. 146). Her symptoms were indicative of a possible urinary tract infection and cleared up with antibiotics. (R. 148). She was discharged on August 15, 1992. (R. 146).

The following day she was readmitted to the hospital complaining of abdominal and flank pain and urinary frequency. (R. 149, 151–154). A urological examination, cystoscopy,[5] and a right retrograde pyelogram[6] were performed and indicated that plaintiff had a stricture[7] of the ureter. (R. 149, 151–154). She underwent a procedure to dilate her ureter and a stent[8] was inserted for drainage. (R. 151–154). She was discharged on August 23, 1992. (R. 151).

On August 27, 1992, Ms. Cottrill was again hospitalized complaining of severe

4. Flank is defined as "the side of the body inferior to the ribs and superior to the ilium [superior portion of the hip bone]." *Dorland's Medical Dictionary* 637, 819 (28th Ed.1994).

5. A cystoscopy is a procedure in which an endoscope is used to visually examine the urinary tract. *Dorland's Medical Dictionary* 421 (28th Ed.1994).

6. A pyelogram is "a radiograph of the kidney and ureter, especially showing the pelvis of the kidney." *Dorland's Medical Dictionary* 1392 (28th Ed. 1392). In a retrograde pyelo-

gram, contrast fluid is injected into the pelvis of the kidney through the ureter. *Id.* Retrograde pyelography is "usually used to relieve rather than diagnose obstructive uropathy." *The Merck Manual* 1829 (17th Ed.1999).

7. A stricture is defined as "a decrease in the caliber of a canal, duct, or other passage." *Dorland's Medical Dictionary* 1590 (28th Ed.1994).

8. A stent is a rod-like device used to support tubular structures. *Dorland's Medical Dictionary* 1577 (28th Ed.1994).

right lower back and flank pain, nausea, vomiting, a urinary tract infection, and increasingly severe pain. (R. 159). She underwent an emergency cystoscopy and placement of a ureteral catheter. (R. 166–167). On September 7, 1992, she underwent surgery to remove adhesions [9] in her small bowel, an ovarian cyst, and an obstruction in her right ureter. (R. 160, 162–163). Bilateral ureteral catheters were also inserted. (*Id.*). She was discharged on September 15, 1992. (R. 159).

To rule out any orthopedic involvement in plaintiff's back and right flank pain, plaintiff was examined by two orthopedists in November and December 1992. (R. 187–193). Only evidence of mild lumbar spondylosis [10] was found. (R. 187). However, the second orthopedist to examine Ms. Cottrill reported to her primary care physician on January 14, 1994 that a bone scan showed evidence of urinary retention in the left kidney. (R. 189). The orthopedist therefore stressed that a urologic evaluation was essential. (*Id.*).

Between June and December 1993, Ms. Cottrill underwent a series of seven surgeries related to her right ureter. (R. 255, 318, 345, 352, 360, 367). She underwent repeated cystoscopy (endoscopy of her urinary tract), bilateral retrograde pyelograms, and insertions and removals of ureteral stents. (*Id.*). On December 28, 1993, she also underwent a percutaneous nephrostomy.[11] (R. 255).

On January 20, 1994, Ms. Cottrill was hospitalized for a right ureteral stricture and small bowel obstruction. (R. 194–195). She underwent surgery to correct her right ureteral stricture and was discharged in good condition on January 20, 1994. (*Id.*).

Ms. Cottrill continued to develop chronic urinary tract infections for which she was treated by Dr. Kavoussi, a surgeon in the Department of Urology at Johns Hopkins Bayview Medical Center. (R. 236–255). On February 3, 1994, Dr. Kavoussi reported that Ms. Cottrill was experiencing recurrent pain, and he indicated that he would perform a cystoscopy and retrograde pyelogram. (R. 254). On April 14 and July 7, 1994, Dr. Kavoussi examined plaintiff and found her to be suffering from urinary tract infections. (R. 248, 250). In an undated Attending Physician's Statement, Dr. Kavoussi opined that Ms. Cottrill would be able to return to work on August 1, 1994. (R. 246).

On October 7, 1994, Dr. Kavoussi again examined Ms. Cottrill and wrote in a progress note that she had chronic flank pain due to obstruction and that she had undergone "a psoas hitchery implant on the right side." (R. 294). He stated that she recovered well from this procedure but that she was experiencing recurrent urinary tract infections. (*Id.*). He wrote that Ms. Cottrill complained of having to urinate frequently during the day and at night. (*Id.*). He indicated that the likely reason for her pain was "reflux" and again placed her on an antibiotic which she had been taking intermittently for suppression of infections. (*Id.*). He also indicated that he told Ms. Cottrill that if she continued to contract such infections and suffer pain despite treatment with antibiotics, her right kidney might have to be removed. (*Id.*). Plaintiff continued to suffer urinary tract infections, (R. 284), and hospital records show that her "non-functioning right kidney" was removed on November 30,

---

**9.** An adhesion is defined as "a fibrous band or structure by which parts abnormally adhere." *Dorland's Medical Dictionary* 29 (28th Ed.1994).

**10.** Spondylosis is defined as "dissolution of a vertebra." *Dorland's Medical Dictionary* 1563 (28th Ed.1994).

**11.** A percutaneous nephrostromy involves the "insertion of a catheter through the skin and into the renal pelvis ... to relieve obstruction and to gain access to the upper urinary tract for a variety of procedures, such as dilation of strictures or removal of calculi." *Dorland's Medical Dictionary* 1110 (28th Ed.1994).

1994.[12] (R. 203).

Following the removal of plaintiff's right kidney, medical records reflect that she continued to suffer urological problems. Treatment notes dated January 19, 1995 and May 1, 1995, indicate that plaintiff had urinary tract infections on those dates. (R. 229, 290).

On June 9, 1995, Dr. Kavoussi completed his second Attending Physician's Statement, this time indicating that Ms. Cottrill suffered bladder and flank pain and chronic cystitis and was totally disabled from any job. (R. 244–245).

On November 1, 1995, Dr. Kavoussi performed a cystoscopy and retrograde pyelography and drained plaintiff's bladder. (R. 284). The pre- and post-operative diagnoses were recurrent urinary tract infection. (*Id.*). The left kidney, however, appeared normal. (*Id.*).

In a report dated January 11, 1996, Dr. Kavoussi summarized Ms. Cottrill's medical history and current status as follows:

> Ms. Cottrill has had chronicle right flank pain secondary to an obstructed kidney. She underwent several procedures both elsewhere and at our institution to try to relieve the obstruction. These were successful, however, she developed chronic infections in her right kidney which subsequently required removal. She has had problems with recurrent episodes of urinary tract infections and recent evaluation demonstrated she has reflux into the stump of her right distal ureter. This may act as a reservoir for persistent infection and it is recommended that she undergo an additional operative procedure to remove the

stump. Because of her persistent infections she has chronic pain and also has the requirement for frequent access to a rest room, sometimes needing to go every twenty minutes.

(R. 201).

On January 15, 1996, due to her recurrent urinary tract infections, Ms. Cottrill underwent surgery to remove her right distal ureter. (R. 202–203, 205–206). She remained hospitalized until January 20, 1996. (R. 202). She experienced several days of fever after the surgery but her condition on discharge was good. (R. 203).

On March 7, 1996, Dr. Kavoussi examined Ms. Cottrill as a follow-up to the surgery. (R. 230). He noted that she was doing well but that she "has had recent infection again for which she underwent [intravenous] Vancomycin since this was the only medicine which [the infection] was sensitive to." (*Id.*).

On March 15, 1996, Dr. Kavoussi referred Ms. Cottrill for placement of a central venous line in her neck so that she could be given an eight day course of intravenous antibiotics to treat another urinary tract infection. (R. 273). On March 27, 1996, Dr. Kavoussi reexamined Ms. Cottrill. (R. 270). He found that the surgical wound from the removal of her right ureter had healed well and reported that an ultrasound showed that plaintiff's left kidney was normal with no evidence of hydronephrosis.[13] (*Id.*).

On March 21, 1996, at the request of the Social Security Administration, Ms. Cottrill was examined by consultative physician Dr. Hubaykah. (R. 221–223). Dr. Hubay-

---

12. After the removal of plaintiff's kidney, her long-term disability insurer assigned a registered nurse and certified rehabilitation nurse, David McCoy, to evaluate when she could return to work. (R. 69–70). Mr. McCoy testified that he met with plaintiff about once a week for six months following the removal of her kidney in November 1994. (R. 70–73). He testified that after following Ms. Cottrill for several months, he believed that she was not a candidate to return to work. (R. 71–

72). He testified that his reasons for this conclusion were that Ms. Cottrill continued to suffer pain and infections even after her right kidney was removed. (*Id.*).

13. Hydronephrosis is defined as "distention of the pelvis and calices of the kidney with urine, as a result of obstruction of the ureter." *Dorland's Medical Dictionary* 785 (28th Ed.1994).

kah issued a report dated March 27, 1996 stating, in part:

> This is a 45–year–old female with multiple recurrent urinary tract infections, status post right nephrectomy. She was able to sit, stand, walk, and lift objects without any difficulty. No hearing or speech impairment. No significant decrease in the range of motion of the spine or major joints....

(*Id.*).

On April 26, 1996, a treatment note indicates that plaintiff had just completed a ten day course of intravenous antibiotics. (R. 226).

On October 7, 1996, due to a finding of blood in plaintiff's urine, Dr. Kavoussi performed a cystoscopy and a left retrograde pyelogram, but there were no abnormal findings. (R. 261–264). Plaintiff was discharged the same day in good condition. (R. 260).

In a report dated April 4, 1997, Dr. Kavoussi wrote that plaintiff continued to suffer from chronic pain in her right lower quadrant with episodes of intensified pain, blood in the urine, and fevers lasting for several days and then resolving. (R. 393–394). However, he indicated that evaluation by cystoscopy, retrograde pyelography, and an MRI over the past six months had not revealed the etiology of her pain or the blood in her urine. (R. 393). He recommended a general surgical consultation, sending plaintiff to a chronic pain management clinic, and continued checks of her left kidney function to make sure it remained stable. (*Id.*).

In an Attending Physician's Statement of Disability dated March 11, 1997, Dr. Yukna, plaintiff's primary care physician, indicated that Ms. Cottrill's condition remained unimproved and that she was totally disabled from any occupation. (R. 395–396).

At the hearing on June 6, 1997, Ms. Cottrill testified that the pain in her back was knife-like and that she experienced pain that was a "ten" on a scale of zero to ten approximately twice a week, sometimes lasting for two to three days. (R. 53). She also testified that she has to go to the bathroom every half an hour to forty-five minutes. (R. 62, 67). She testified that her pain was severe from 1992 through the time of the hearing with the exception of a two month period in 1996 during which she experienced some relief after the removal of part of her "urethra tube." (R. 40). She testified that her daily activities include light dusting, occasional dish washing, light cooking using the microwave, reading, watching television, and occasionally talking on the phone and accompanying her daughter to the grocery store. (R. 58–61). She indicated that she does not go to church, vacuum, sweep, or do laundry. (*Id.*).

### V. *Analysis*

█ Plaintiff raises two arguments to support her contention that the ALJ's decision is erroneous and is not supported by substantial evidence.[14] For the reasons that follow, the Court remands this case to the Commissioner for further proceedings.

### A. *The ALJ Erred at Step Two of the Sequential Analysis in Concluding that Plaintiff Did Not Have a Severe Impairment.*

Plaintiff argues that the ALJ erred at step two of the sequential analysis in find-

---

**14.** Defendant contends that Ms. Cottrill's failure to raise these arguments before the Appeals Council precludes her from raising them before this Court. (Paper No. 14 at 3–4). Although it is true that Ms. Cottrill failed to specifically articulate these arguments before the Appeals Council, her failure to do so does not operate to preclude the Court from considering the merits of her contentions.

Earlier this month, the Supreme Court held that social security claimants who "exhaust administrative remedies need not also exhaust issues in a request for review by the Appeals Council in order to preserve judicial review of those issues." *Sims v. Apfel,* —— U.S. ——, ——, 120 S.Ct. 2080, 2086, —— L.Ed.2d —— (2000). Accordingly, the Court will address the merits of Ms. Cottrill's arguments.

ing that her urological impairments were not "severe." (Paper No. 13 at 16). According to plaintiff, there is overwhelming medical evidence in the record to support her claim of a totally disabling impairment from June 24, 1992 through October 20, 1997. (*Id.*). Defendant argues that the ALJ's decision that Ms. Cottrill did not suffer a severe impairment is supported by substantial evidence because the medical evidence fails to show that she had a severe impairment of the requisite duration under the Social Security regulations. (Paper No. 14 at 9). Defendant also argues that plaintiff has failed to articulate any functional limitations and has not provided medical evidence of any functional limitations. (Paper No. 14 at 9).

For the reasons that follow, the Court finds substantial evidence that plaintiff's recurrent urinary tract infections constitute a "severe" impairment. Moreover, the Court finds that this severe. impairment met the duration requirement imposed by the regulations during the time period plaintiff was eligible for DIB (*i.e.,* from February 5, 1995 to September 30, 1996).

Before a claimant can be found disabled under Social Security regulations, he or she must first establish the existence of a "severe" impairment which is expected to "result in death" or has lasted or is expected to last "for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a) and § 404.1520(a). To be "severe," an impairment must significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). "Basic work activities" are defined as "those abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). Examples of "basic work activities" provided in the regulations include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding

appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

■ Significant limitation of a claimant's ability to do basic work activities is not to be viewed solely in medical terms, but also in functional terms. *Jones v. Schweiker,* 551 F.Supp. 205, 208 (D.Md.1982). "An impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Evans v. Heckler,* 734 F.2d 1012, 1014 (4th Cir.1984).

With respect to whether a claimant's impairments are severe at step two of the sequential analysis, Social Security Ruling 85–28 provides, in pertinent part, the following guidance to an ALJ: "[I]f an adjudicator is unable to determine clearly the effect of an impairment or the combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with a not severe evaluation step. Rather, it should be continued." Social Security Ruling 85–28 (1985).

■ In this case, the ALJ was "unable to find that there was a 12 month period when the claimant suffered from a condition that produced significant limitation on her physical or mental ability to perform basic work activities." (R. 16). Specifically, the ALJ found at step two of the sequential. analysis that Ms. Cottrill's right nephrectomy and recurrent urinary tract infections were not "severe" impairments. (R. 21).

A review of the medical evidence establishes, as the ALJ recognizes in his written decision, that plaintiff's urological problems began in January 1992 and that chronic infections eventually led to the removal of her right kidney on November 30, 1994. (R. 15). Plaintiff's chronic infections, however, did not cease with the removal of her kidney and, in fact, uncontra-

dicted medical evidence establishes that she continued to experience chronic urinary tract infections necessitating medical treatment at least through April 1996.[15]

The ALJ, however, determined that the recurrent urinary tract infections had no effect on plaintiff's ability to do basic work activities. Specifically, the ALJ wrote that "[s]ignificantly, the claimant's treaters have not suggested that claimant's ability to perform basic work activities has been affected by her recurrent urinary tract infections." (R. 17). He also indicated that he did not give "controlling weight" to a June 1995 assessment by plaintiff's treating urological surgeon, Dr. Kavoussi, which stated that plaintiff was indefinitely disabled, because Dr. Kavoussi failed to identify any "limitations stemming from claimant's recurrent urinary tract infections." (R. 16).

On the contrary, Dr. Kavoussi, on more than one occasion, identified limitations associated with plaintiff's recurrent urinary tract infections. Dr. Kavoussi's June 1995 assessment indicates that plaintiff was experiencing urinary frequency and persistent flank pain in connection with her infections. (R. 245). His report dated January 11, 1996 again states that

plaintiff was experiencing chronic pain and urinary frequency due to the recurrent infections. (R. 201). In the January 11, 1996 report, Dr. Kavoussi also states that plaintiff required frequent access to a restroom, sometimes every twenty minutes. (*Id.*). Thus, the ALJ's conclusion that no functional limitations were established by the medical evidence pertaining to plaintiff's urinary tract infections is not supported by substantial evidence. The medical evidence, in fact, establishes that the pain and urinary frequency associated with plaintiff's recurrent urinary tract infections "constituted more than a "slight abnormality which ... would not be expected to interfere with the ability to work" thereby meeting the standard for severity". *Evans*, 734 F.2d at 1014.

In his written decision, the ALJ appears to have recognized that pain can be disabling in terms of a claimant's ability to work. (R. 20). However, he concludes that plaintiff's allegations of pain "[do] not support a finding that she has a severe impairment" because there was an "absence of objective medical evidence to support the existence of an impairment, prior to September 30, 1996, that would produce the type of symp-

15. On January 19, 1995 and May 1, 1995, treatment notes reflect that plaintiff had a urinary tract infection. (R. 229, 290). On June 9, 1995, Dr. Kavoussi, plaintiff's urological surgeon, opined that she was disabled for an indefinite period of time due to recurrent urinary tract infections, cystitis (inflammation of the urinary bladder), and urinary frequency. (R. 245). On November 10, 1995, Dr. Kavoussi wrote that plaintiff "has recurrent infections." (R. 232). In January 1996, Dr. Kavoussi determined that plaintiff should undergo removal of her right ureter because "reflux" into this ureter was likely creating a "reservoir for persistent infection" which, in turn, caused chronic pain. (R. 201). On January 15, 1996, Ms. Cottrill underwent surgery to remove her ureter and remained hospitalized for five days. (205–206). In March 1996, she suffered another urinary tract infection necessitating the administration of an eight day course of intravenous antibiotics. (R. 230, 273). On April 26, 1996, a treatment note indicates that she had just completed a ten day course of intrave-

nous antibiotics, presumably for another urinary tract infection. (R. 226).

The ALJ appears to have overlooked this evidence in concluding that plaintiff's impairments did not prevent her from doing basic work activities for a twelve month period. (R. 16). With respect to whether plaintiff's impairments met the duration requirement, the ALJ's written decision reflects that he focused on the evidence pertaining to the three major medical events which occurred shortly before and during plaintiff's period of DIB eligibility. (*Id.*). These events were the removal of her kidney on November 30, 1994; "further corrective surgery" in January 1996; and the administration of intravenous antibiotics by a home health nurse for several months in early 1996. (*Id.*). While this focus led to a finding that plaintiff's "kidney and urinary conditions" did not last for a twelve month period, that finding is not supported by the evidence because it does not reflect consideration of plaintiff's recurrent urinary tract infections and the associated problems.

toms she alleges." [16] (*Id.*).

In light of the above-noted records from Dr. Kavoussi which state that plaintiff's chronic pain was caused by her recurrent urinary tract infections and the unrefuted medical evidence documenting the recurrence of those infections, the ALJ's conclusion that there was an "absence" of medical evidence to support plaintiff's allegations of disabling pain is not supported by substantial evidence. Given the evidence, the ALJ should have considered whether plaintiff had established "the existence of a medical impairment which could reasonably be expected to produce the actual pain in the amount and degree alleged by [her]." [17] *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir.1996); *see* 20 C.F.R. § 404.1529 (establishing procedure for evaluating whether person is disabled by pain). By concluding, erroneously, that there was an "absence" of such medical evidence to support plaintiff's allegations of pain, the ALJ, in essence, foreclosed analysis of one of the two principal functional limitations identified by the plaintiff.

In sum, the Court finds that plaintiff's recurrent urinary tract infections and chronic pain constituted a "severe" impairment meeting the duration requirement during her period of eligibility for DIB. Accordingly, this case will be remanded to the ALJ so that he may continue his evaluation of plaintiff's impairments through the remaining steps of the sequential analysis to determine whether plaintiff was disabled during her period of eligibility for DIB.

Because the Court is remanding this case for continued evaluation under the five-step sequential analysis, the Court will now briefly address plaintiff's argument concerning the allegedly unfair amendment of her disability onset date at the hearing before the ALJ.

**B.** ***If on Remand Plaintiff is Found Eligible for DIB, Her Original Onset Date Should Be Used as the Starting Point to Determine When Her Disability Began for Purposes of Calculating the Amount of Her Monthly Benefit Payment.***

Plaintiff maintains that the ALJ induced her to amend her onset date from June 24, 1992 to February 5, 1995 without realizing himself or informing her that by doing so her benefit payments might be lower if she were ultimately found disabled.[18] (Paper No. 13 at 21).

Having reviewed the hearing transcript, it appears, as plaintiff alleges, that the ALJ was unaware of the possibility that the amendment of plaintiff's onset date could impact the amount of her DIB payment if he found her disabled. Furthermore, under the Social Security regu-

---

**16.** Plaintiff testified about her pain during the June 1997 hearing. She testified that since 1992 she has experienced nearly constant pain. (R. 54). She testified that approximately twice a week the pain is a "ten" on a scale of one to ten and that on those days she gets off her feet, lays on a heating pad, or takes a hot bath. (R. 52–53).

**17.** If the existence of such a medical impairment is established, an ALJ must then "evaluate the intensity and persistence of the claimant's symptoms, including pain, to determine the extent to which those symptoms limit the claimant's capacity to work." *Craig v. Chater*, 76 F.3d 585 at 595.

**18.** Plaintiff also alleges that by inducing her to amend her onset date, the ALJ "relieved himself of the responsibility of consideration of medical evidence prior to February 5, 1995" and, in fact, erred by not considering this medical evidence. (*Id.* at 21, 22). Defendant maintains that the ALJ's written decision shows that he gave careful consideration to the medical evidence prior to February 5, 1995 in reaching his disability decision. (Paper No. 14 at 15).

Having reviewed the ALJ's written decision, the Court finds no indication that the ALJ interpreted the amendment of plaintiff's disability onset date as relieving him of the obligation to consider the medical evidence preceding this date, at least as it pertained to providing a background for analysis of plaintiff's allegation of disability during the time period at issue here (*i.e.*, the time period during which she was eligible for DIB which spans from February 5, 1995 to September 30, 1996). (R. 15).

lations pertinent to calculation of a claimant's monthly DIB amount, it appears that the amendment of plaintiff's disability onset date could indeed negatively impact the amount of her monthly DIB payment.[19] Accordingly, if, on remand, the ALJ determines that plaintiff is entitled to DIB, he should make a finding as to whether, for purposes of calculating the amount of her monthly benefit payment, her disability actually began prior to her amended onset date of February 5, 1995. In making this finding, the ALJ should use plaintiff's original disability onset date of June 24, 1992 as the starting date in his analysis.

## VI. *Conclusion*

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment will be granted, the Defendant's Motion for Summary Judgment will be denied, the Commissioner's decision denying benefits is reversed, and this case is remanded for further proceedings consistent with this Memorandum. A separate order shall issue.

## ORDER

For the reasons stated in the foregoing Memorandum, it is this _____ day of June, 2000, hereby **ORDERED** that:

1. the Plaintiff's Motion for Summary Judgment (Paper No. 13) is **GRANTED**;

2. the Defendant's Motion for Summary Judgment (Paper No. 14) is **DENIED**;

3. the decision of the Commissioner denying benefits is reversed, and the case is remanded for further proceedings consistent with this Memorandum; and

4. the Clerk shall mail copies of this Order and the accompanying Memorandum to counsel of record.

---

**19.** The Social Security regulations contain complex rules for computing the amount of a disabled claimant's monthly disability insurance benefit payment. *See* 20 C.F.R., Ch. III, Subpt. C, § 404.201 *et seq.* In order to determine the amount of a claimant's monthly benefit payment, the Social Security Administration must first calculate the claimant's "primary insurance amount." 20 C.F.R., Ch. III, Subpt. C, § 404.201. In determining the total number of years used to compute a claimant's primary insurance amount, years during which a claimant was disabled are generally not counted. § 404.211. Thus, as plaintiff argues, "a disabled individual would not be penalized for years of non-earnings during a period of disability." (Paper No. 13 at 21).

Plaintiff did not work during 1993 and 1994. (R. 101). Therefore, if plaintiff were found disabled as of her original disability onset date (June 24, 1992) and her years of non-earnings were accordingly excluded, her monthly benefit amount might be higher than if the amended disability onset date were used.